<pre>
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    CENTRAL DIVISION at LEXINGTON
                              - - -
 3
     UNITED STATES OF AMERICA,     : Docket No. 5:25-cr-86
 4                                 :
                      Plaintiff,   : Lexington, Kentucky
 5                                 : Tuesday, July 8, 2025
                                   : 1:00 p.m.
 6   versus                        :
                                   :    **Via Electronic Recording**
 7   LAURANCE D. NEWBY,            :
                                   :      **EXCERPTED TRANSCRIPT**
 8                    Defendant.   : **Testimony of Christine McHugh**

 9                              - - -
                     TRANSCRIPT OF DETENTION HEARING
10                    BEFORE MATTHEW A. STINNETT
                   UNITED STATES MAGISTRATE JUDGE
11                              - - -

12   APPEARANCES:

13   For the United States:        ROGER WEST, ESQ.
                                   U.S. Attorney's Office
14                                 260 West Vine Street
                                   Suite 300
15                                 Lexington, KY 40507

16   For the Defendant:            RICHARD W. WESTON, ESQ.
                                   Weston Law
17                                 P.O. Box 21733
                                   Lexington, KY 40522
18
     Transcriber:                  LISA REED WIESMAN, RDR-CRR
19                                 Official Court Reporter
                                   35 W. Fifth Street
20                                 Covington, KY 41011
                                   (513) 266-6271
21

22

23

24
         Proceedings recorded digitally, transcript produced by
25   computer.
</pre>

1                                  * * *

2          THE COURT:  Mr. Weston, proffer of fact or witness on

3     the issue of Mr. Newby's release.

4          MR. WESTON:  We'd like to call Christine McHugh if

5     she's here, Your Honor.

6          THE COURT:  Certainly she is.

7       Agent McHugh.

8            CHRISTINE McHUGH, DEFENSE WITNESS, SWORN

9          THE COURT:  Agent McHugh, once you're settled, state

10    your full name and spell your last name for me.

11         THE WITNESS:  Christine McHugh, M-c-H-u-g-h.

12         THE COURT:  Thank you.

13      Mr. Weston.

14                        DIRECT EXAMINATION

15    BY MR. WESTON:

16    Q.   Am I correct that you authored an affidavit in this case

17    for a criminal complaint?

18    A.   I did.

19    Q.   Okay.  And are you the lead agent on the investigation of

20    Mr. Newby?

21    A.   Yes, I am.

22    Q.   And how did it come about that you began this

23    investigation of him?

24    A.   We started this investigation a long time ago on him, and

25    we've had information through CIs and surveillance efforts.

1   Q.   Was there any information about him having firearms?

2   A.   We have heard that he's carried firearms before, yes.

3   Q.   Well, was there any information recent to the arrest at

4   the Avid about that?

5   A.   We just knew that there's potential, yes.

6   Q.   Where did you know that potential?

7   A.   Just knowing that he's had firearms prior.

8   Q.   Is that from prior charges?

9   A.   Information given to us that he's carried a firearm

10  before and prior charges.

11  Q.   And how recent was that to the Avid Hotel arrest in this

12  case?

13  A.   It's been quite some time, but I'm not sure exactly how

14  long.

15  Q.   And what caused the investigation to come to the Avid

16  Hotel?

17  A.   Just numerous surveillance efforts and a decision we made

18  based on stuff we have seen.

19  Q.   What did you see?

20  A.   Him placing bags into his vehicle on that day.

21  Q.   Placing bags into a vehicle certainly is not illegal.

22  Could you elaborate what made that criminal?

23  A.   Just knowing his history and utilizing those hotels for

24  drug trafficking.

25  Q.   So was there any information that he had drugs or just

1    that you saw him with bags?

2    A.   We had reason to believe that he did have narcotics on

3    him, yes.

4    Q.   What gave you that belief?

5    A.   Information that was provided and surveillance efforts.

6    Q.   What was the information?

7    A.   That it was --

8          MR. WEST:  Objection.  It's not a discovery hearing.

9    What took place prior to his arrest is somewhat immaterial in

10   regards to his beliefs (indiscernible).

11         THE COURT:  Mr. Weston?

12         MR. WESTON:  Your Honor, it goes to the weight of the

13   evidence.  That's one of the factors, and I believe that it

14   will become real relevant the further I ask.

15         THE COURT:  Overruled.  Go ahead.

16   BY MR. WESTON:

17   Q.   You can answer.

18   A.   Oh, okay.  Sorry, what was -- what is the question?

19   Q.   Yeah.  I think you said bags are why you made a reason --

20   and I'll paraphrase.  That you saw him with bags, and I asked

21   what led you to believe there was some criminality.  I think

22   you maybe said something about suspicion.

23        Could you tell me what made you think there were drugs?

24   A.   We've received information that he does travel to places

25   with the narcotics and places in bags and puts them in his

1  vehicle.

2  Q.  And was there any specific information about the Avid

3  Hotel?

4  A.  Not that hotel, but we know that he was utilizing them,

5  yes.

6  Q.  Why were you surveilling him on the day of this arrest or

7  near that?

8  A.  We were going to attempt to arrest him at some point so

9  we were conducting surveillance on him.

10  Q.  Now, were you conducting surveillance to make an arrest

11  or for information that might lead to criminal that would be

12  an arrest?

13  A.  I'm not sure I understand.

14  Q.  Okay.  Ma'am, you said surveillance to arrest him.  Were

15  you looking for evidence of criminality or that you already

16  had evidence to arrest him and then you were just trying to

17  find him?

18  A.  I think it was actually a mix -- a mix of both.  We did

19  have stuff we could arrest him for.  Additionally, we were

20  going to conduct something that would lead to his arrest, yes.

21  Q.  Okay.  So tell me what happened on the day of this

22  arrest.

23  A.  On that day, he had put bags into his vehicle.  He

24  checked to make sure it was locked.  He went for a walk.  When

25  he came back -- we had ran a dog on his vehicle.  On his way

1    back, we approached him.  A dog alerted on his vehicle.

2          We approached him, and I introduced myself to him.  I let

3    him know that we just wanted to speak with him.  He went

4    into -- we went to do a frisk to make sure he didn't have a

5    weapon.  He reached for his pocket, turned to run, and then

6    interdiction had tasered him.

7    Q.   Who all was part of this team that was with you that day?

8    A.   Members of the DEA and Kentucky State Police.

9    Q.   How many people?

10   A.   Also members of Lexington PD, excuse me.  At least, give

11   or take, ten.

12   Q.   So at what time did he put bags in the vehicle?

13   A.   I don't remember the exact time, but it was close to

14   noontime.

15   Q.   And can you tell me what you saw first as what may have

16   been reported to you?

17   A.   It was reported to me that he placed the bags and

18   double-checked the locks that day.  Is that -- I'm not sure if

19   I answered your question.

20   Q.   What did you see him do before he went on the walk?

21   A.   I didn't see him do anything.  I'm told.

22   Q.   Okay.  Where were you when this was going on?

23   A.   I was at the office at that time.

24   Q.   And he puts something in the vehicle.  Do you know what

25   bags he put in the vehicle?

1    A.   I don't recall.  I know one of them was a backpack, and

2    then I don't recall the other bag --

3    Q.   Okay.  Was this --

4         (Indiscernible crosstalk.)

5    A.   -- top of my head.

6    Q.   Excuse me.  I interrupted.

7    A.   I said off the top of my head.

8    Q.   Was this on video?

9    A.   I don't believe it was on video.

10   Q.   Okay.  Was the dog search on video?

11   A.   They wear body-worn cameras so I'm pretty sure that was,

12   yes.

13   Q.   Who made the determine to search the vehicle?

14   A.   I believe I did.

15   Q.   And why was that?

16   A.   We had reasonable belief that there was narcotics in the

17   vehicle.

18   Q.   And did you go get a warrant after that search -- or

19   after that sniff?

20   A.   No.  It was an open-air sniff.  Probable cause.  It was a

21   probable cause search.

22   Q.   So why didn't you get a warrant?

23   A.   Why didn't I need a warrant?

24   Q.   Why did you not go get a warrant?

25   A.   I don't believe I needed a warrant on a probable cause

1    sniff.

2    Q.   Do you know what drugs the dog hit on, allegedly?

3    A.   I do not.

4    Q.   Do you know --

5    A.   I know that they're trained for multiple narcotics.

6    Q.   Do you know whether they're trained to hit on marijuana?

7    A.   I don't know specifically on that dog, no.

8    Q.   So after that sniff, was that done while he was on the

9    walk?

10   A.   Yes.

11   Q.   Okay.  And then what happened after the sniff?

12   A.   We waited 'til he came back and approached him.

13   Q.   Okay.  So you were at the office when the sniff happened,

14   right?

15   A.   No.  I'm sorry.  I must have misspoken.  I was at the

16   office when they said he placed the bags into the vehicle.

17   The sniff happened when I was present.  I wasn't present at

18   the vehicle.  I was present near the -- where he was walking.

19   Q.   And where did he walk to?

20   A.   It's a trail that runs -- I forget the name of it right

21   now.  Brighton Trail, I believe, that runs in the Hamburg

22   area.

23   Q.   And how long was he gone?

24   A.   Probably 20 minutes.  I'm not that good on the time, I'm

25   sure.

1    Q.   So --

2    A.   Maybe 30.

3    Q.   I'm sorry?

4    A.   Maybe 30.  I don't know actually how long he was on a

5    walk for.

6    Q.   What made you decide to approach him?

7    A.   We thought it was reasonable to try to talk to him and

8    let him know the situation and get out of the heat and not

9    make a big scene.  So we decided to try and talk to him.

10   Q.   Okay.  And who all was with you when you approached him?

11   A.   On foot, you mean, at the time?

12   Q.   Well, overall and on foot.

13   A.   I had two DEA workers with me and then KSP.  There was

14   three or four of them with me.

15   Q.   And did he have on workout gear?

16   A.   He had a jumpsuit on, yes, like a -- a zip-up jacket and

17   workout pants, yes.

18   Q.   Perhaps meaning he was exercising, correct?

19   A.   He could have been, yes.

20   Q.   And what was said when you approached him?

21   A.   I introduced myself to him, and we explained that we'd

22   like to talk to him and let him know what was going on.  We

23   were trying to get out of the heat and not make a big scene.

24   Q.   Was he being detained at that time?

25   A.   Yeah, he was being detained due to the sniff, yes.

1   Q.   Did you articulate that to him?

2   A.   I didn't -- I believe the other gentleman might have, but

3   I don't know.  I don't recall what he said.  I did not state

4   that, though.

5   Q.   Is this on video?

6   A.   I know KSP had their cameras going, yes.

7   Q.   Okay.  So you didn't tell him that he was being detained,

8   right?

9   A.   I don't think I used the word "detain," no.

10  Q.   And you mentioned something in your affidavit about an

11  attempt to pat him down --

12  A.   Yes.

13  Q.   -- is that correct?

14  A.   Yes, a *Terry* frisk.

15  Q.   Okay.  Was he told that he was being stopped for a *Terry*

16  frisk?

17  A.   No.  I believe the individual just said -- asked him if

18  he had any weapons on him and went to make sure that he had no

19  weapons.

20  Q.   Did he actually make a move to make sure he had no

21  weapons?

22  A.   Did the agent?

23  Q.   Yes, ma'am.

24  A.   Yes.

25  Q.   Okay.  How would he have known that he had to stop at

1    that time?

2         MR. WEST:  Objection, please.  Calls for conjecture

3    of what is in the defendant's mind.

4         THE COURT:  Sustained.

5    BY MR. WESTON:

6    Q.   Did you articulate in any way at that time that he was

7    under arrest or that he was being detained?

8    A.   I just explained to him that we had a scenario that we

9    wanted to explain to him.

10   Q.   Can you answer that with a yes or no?

11   A.   I felt like he might not have understood me, but that's

12   what I was telling him, that we would like to speak with him,

13   yes.

14   Q.   How long did the interaction occur between you, the other

15   agents, and Mr. Newby?

16   A.   I don't know the time frame.  It didn't seem very long.

17   Q.   And then what happened after the talking stopped?

18   A.   Well, as soon as he turned to run and he put his hand in

19   his pocket, the talking stopped right then.

20   Q.   And what happened after that happened?

21   A.   He was arrested at that point.

22   Q.   How come?

23   A.   For fleeing.  And then he was searched, and there was

24   cocaine in his pocket.

25   Q.   Well, how could he flee if you never informed him that he

1    was under arrest and that he was being detained?

2    A.   I think when he went for his pocket, I don't -- I'm not

3    sure what you mean.

4    Q.   Well, to flee, you have to do something to be arrested

5    for.   It doesn't sound like you articulated anything that he

6    was being arrested or detained for.

7            MR. WEST:   Objection, please.   The charge of fleeing

8    and evading is not before the Court at this time.   It's a

9    state charge.   The question is inappropriate for this agent.

10           THE COURT:   I'm going to sustain until we get into

11   the legal argument.   I'm happy to consider all facts,

12   Mr. Weston.   Wait until legal argument, as the elements of

13   fleeing and evading are a state charge.   For the federal

14   agent, I don't really think that's relevant to the discussion

15   of whether or not he's a danger to the community or a risk of

16   nonappearance.

17           MR. WESTON:   I think it goes to the weight of the

18   evidence, Your Honor, because what eventually we're going to

19   get to is they seized a firearm based upon this by taking a

20   key out of his pocket and searching the vehicle.   And,

21   therefore, the Court can certainly consider whether evidence

22   might potentially be suppressed in the weight of the evidence.

23   I think it's pretty strong in this case, Your Honor.

24           THE COURT:   I actually can't consider whether or not

25   suppression comes in at the detention stage without

1   (indiscernible).  The case law is very clear on that.  So

2   whether it's suppressible or not is a fight for another day.

3   I can't --

4          MR. WESTON:  I thought you could consider it if it

5   goes towards dangerousness.  I may be wrong.  I'll be quiet

6   after this.  My understanding is that evidence can come in

7   that may be suppressed, but the Court can consider it in the

8   weight of the evidence.

9          THE COURT:  I can consider anything in the weight of

10  the evidence.  Yes, that's a fair point.

11     My point was quizzing her over the elements of fleeing

12  and evading I don't think is really getting us to the actual

13  issue here of danger.

14     I understand the point you're trying to make with her,

15  whether he reached or not.  I'm going to sustain the

16  objection, and let's move on past that element issue and let's

17  get back to the facts and what happened.

18     That's what I care about relevant to the determination of

19  Mr. Newby's danger and risk of nonappearance.

20         MR. WESTON:  Thank you, Your Honor.  I'll move on.

21  BY MR. WESTON:

22  Q.  So how he was detained after he allegedly reached for his

23  pocket?

24  A.  I'm sorry.  He was -- after he reached for his pocket and

25  turned to run, he was tasered and detained.

1   Q.   And he was handcuffed at that time?

2   A.   Yes.

3   Q.   Okay.

4   A.   Yes.

5   Q.   And did he make any statements at that time?

6   A.   He just said he gets in trouble for drug stuff, and he

7   doesn't do anything wrong.  At that time, he made those

8   statements.

9   Q.   Am I correct you all got the key out of his pocket?

10  A.   Yes.

11  Q.   Did he voluntarily give that to you, or did you all take

12  it out of his pocket?

13  A.   That was seized out of his pocket.

14  Q.   Who got it out of his pocket?

15  A.   I'm not sure.

16  Q.   How close was he to the vehicle at this time?

17  A.   Maybe at least a football field.

18  Q.   And what happened --

19  A.   And my measurements might be off, but that's --

20  Q.   Approximately?

21  A.   Yeah.

22  Q.   What happened after the key was taken out of his pocket?

23  A.   He was brought to the office.

24  Q.   And did you search the vehicle at that time?

25  A.   Yes.

1    Q.   Who took the key?

2    A.   Somebody handed it to me.  I handed it off to another

3    agent.

4    Q.   And what --

5    A.   I was not on scene at that point.  I went back to the

6    office so I'm not sure.

7    Q.   Who was on scene at that point?

8    A.   There was multiple people over there.

9    Q.   And did you direct them to enter the vehicle with the

10   key?

11   A.   Yes.

12   Q.   And why did you do that, as opposed to getting a warrant?

13   A.   They had a probable cause.

14   Q.   Why didn't you just break the window and search the

15   vehicle if you had probable cause?

16   A.   Well, we prefer not to do damage to stuff when there's no

17   need.

18   Q.   So what was found in the vehicle?  Tell me about what

19   happened -- you weren't there -- to your knowledge.

20   A.   To my knowledge, in one of the bags that was placed in

21   the vehicle, there was a kilo of cocaine.  In the back of the

22   vehicle, there was approximately half a kilo of fentanyl and a

23   gun.  I believe the gun might have been located with the

24   cocaine in the bag.

25   Q.   And were they in a backpack, the gun and the cocaine?

1    A.   Yes.

2    Q.   Did you have a warrant to search that backpack?

3    A.   It was part of the probable cause on search of the

4    vehicle.

5    Q.   From the original dog sniff?

6    A.   Yes.

7    Q.   Where was the fentanyl found?

8    A.   I believe it was found in the back of the vehicle, in the

9    trunk area.

10   Q.   Was it in plain sight, or was it in a compartment?

11   A.   I believe it was in a compartment part of the vehicle.

12   Q.   Do you have any idea?

13   A.   I don't know if that was opened.  I don't know if they

14   opened anything so ...

15   Q.   All right.  Now, it's my understanding that originally,

16   somebody -- tell me who -- used a mass spectrometer to test

17   the fentanyl and it came back negative.  Is that correct?

18   A.   I believe they tried to use that, and then they used a

19   liquid form on the second attempt to test it.

20   Q.   A mass spectrometer, can you tell me a little bit about

21   how that works to test drugs?

22   A.   Basically, it's a laser that's pointing into the

23   narcotics, and it will test what's -- what it can detect.

24   Q.   And was the one we're talking about --

25   A.   It's a safer technique whenever we're dealing with

1   narcotics.

2   Q.   Is the one we're talking about a DEA mass spectrometer,

3   or is it Kentucky State Police?

4   A.   So we have a task force officer with the Kentucky State

5   Police that has one, but I don't know if they used the

6   Kentucky State Police one or our TFO's.  I'm not sure whose.

7   Q.   And after it tested negative, is that when you used

8   another type of field test?

9   A.   I don't believe it was negative.  It might have been an

10  undetected narcotic, which happens a lot with fentanyl if

11  there's cut.  But then, yes, they used another field test.

12  Q.   Can you explain that to me about undetected narcotic

13  versus a false test?

14  A.   Usually, if there's too many additives to the substance

15  or there's baggage that's interfering with the laser, it's

16  harder to detect what's there.

17  Q.   And then what was the second test done?

18  A.   I believe it was the liquid form of it, but I'm not sure

19  what they did.

20  Q.   Is that what we might colloquially call a color test?

21  A.   Yes, technically.

22  Q.   What's the false positive rate on that?

23  A.   I'm not sure.

24  Q.   Is it pretty high?

25  A.   I'm not sure.

1    Q.   Has there been any testing done after that test before

2    the indictment, such as in a laboratory?

3    A.   It's been sent off to the lab.  The results have not come

4    back yet.

5    Q.   Did he make any statements to incriminate himself?

6    A.   No.  He spoke with us later, yes.

7    Q.   And did he incriminate himself?

8    A.   He explained where he got the narcotics, yes.

9    Q.   And what did he say?

10   A.   He told -- well, he kind of told a roundabout story of

11   where he received the narcotics.

12   Q.   Was that recorded?

13   A.   No.

14            MR. WESTON:  That's all I have.  Thank you.

15            THE COURT:  Mr. West?

16            MR. WEST:  Yes, sir.  Thank you, sir.

17                           CROSS-EXAMINATION

18   BY MR. WEST:

19   Q.   Ms. McHugh, in your testimony a moment ago, you talked

20   about staying at an Airbnb and a rental place.  Am I correct

21   there?

22   A.   No.  He's utilized hotels.

23   Q.   Hotels?

24   A.   Yes.

25   Q.   But he doesn't use Airbnbs?

1    A.   Not to my knowledge.

2    Q.   Does he have a permanent residence?

3    A.   Yes.

4    Q.   In the surveillance that was done by DEA and other

5    officers, did they have him a legitimate source of employment?

6    A.   No.

7    Q.   So any idea how he pays for the hotels that you're

8    talking about?

9    A.   No.

10   Q.   Now, you were asked a question a moment ago about field

11   test positive?

12   A.   Mm-hmm.

13   Q.   Do you see in the (someone coughed) that you all have,

14   did the suspected cocaine test positive for cocaine?

15   A.   The cocaine, yes.

16   Q.   And the fentanyl initially did not, but a subsequent test

17   did test positive for cocaine, correct?

18   A.   That's what I was told, correct.

19   Q.   How much cocaine was located?

20   A.   Approximately a kilo.

21   Q.   How much was a kilo worth, street value, on the day of

22   his arrest?

23   A.   So that can vary, but I would say at this time

24   approximately $21,000 for a kilo.

25   Q.   And roughly a half pound of fentanyl, correct?

1    A.   Yes.  Half a kilo.

2    Q.   I'm sorry?

3    A.   Half a kilo.

4    Q.   So it would be about a pound, correct?

5    A.   Yes.

6    Q.   How much was a pound of fentanyl worth?

7    A.   That also varies.  I just know it to be around $2,000 for

8    an ounce at this time so ...

9    Q.   Counsel asked if the defendant made any statements; is

10   that correct?  Do you recall that question?

11   A.   Yes.

12   Q.   Subsequent to his arrest at that site, I guess he was

13   removed to DEA headquarters?

14   A.   I'm sorry?

15   Q.   Subsequent to his arrest or stop, he was removed to DEA

16   headquarters?

17   A.   Correct.

18   Q.   And you asked him about his source?

19   A.   Yes.

20   Q.   What did he say?

21   A.   He provided a couple different names that he received

22   narcotics from.

23   Q.   All right.  You'd all done surveillance on him for a

24   period of time, correct?

25   A.   Correct.

1  Q.  Was any of the information he provided accurate?

2  A.  Somewhat.

3  Q.  Did you also get an opportunity to look into his phone?

4  A.  Yes.  He gave consent to his phone.

5  Q.  And, generally, what was in his phone?

6  A.  Drug trafficking.

7  Q.  Such as?

8  A.  When they were going to meet, locations, stuff like that.

9  Q.  Did it indicate that he was distributing to more than one

10 person?

11 A.  That he was distributing to more --

12 Q.  Yes, sir.  Yes, ma'am.

13 A.  He didn't indicate who he was distributing to.

14 Q.  Okay.  Did he take pictures that were located on the

15 phone?

16 A.  I did not ask -- I didn't see any pictures, no.

17 Q.  Do you think that Mr. Newby represents a threat to the

18 community if he's released?

19 A.  Yes.

20       MR. WEST:  That's all at this time, Your Honor.

21       MR. WESTON:  Just a quick follow-up, Your Honor.

22                    REDIRECT EXAMINATION

23 BY MR. WESTON:

24 Q.  You were asked about the weight of the fentanyl.

25 A.  Yes.

1    Q.   How was it packaged?

2    A.   That was vacuum sealed.

3    Q.   Okay.  And I think your affidavit spoke about it was

4    packaged in multiple packages.  Can you tell me how that went?

5    A.   You're saying what was seized from his vehicle, how was

6    it packaged?

7    Q.   Yes, ma'am.  I'll tell you what I'm getting at.  It seems

8    from your affidavit that it was slightly over 400 grams, which

9    triggers the mandatory minimum; whether that 400 is counting

10   the packaging or not.

11   A.   So I know that there was a chunk that was vacuum sealed,

12   and then there were smaller baggies that were in, like, a

13   plastic bag.  I don't know how many there were of those, but

14   that was the sum of all of them.

15   Q.   So, roughly, how many baggies or packaging are we talking

16   about?

17   A.   So the vacuum sealed was one bag, and then there was -- I

18   really don't know the amount, but maybe five.

19   Q.   So when we're talking about --

20   A.   I would say they were in ounce quantities, but I

21   really -- just looking at a picture, not weight on that one.

22   Q.   So when we're talking about the amounts listed in the

23   indictment, is that including packaging?

24   A.   Yes.  I believe that was gross grams.

25        MR. WESTON:  That's all I have.  Thank you.

1    THE COURT:  Thank you.  Agent McHugh, you may step

2    down.  You're excused.

3    * * *

4    C E R T I F I C A T E

5    I, LISA REED WIESMAN RDR-CRR, certify that the
foregoing is a correct transcript from the electronic
6    recording proceedings in the above-entitled matter,
transcribed to the best of my ability to hear and understand
7    said recording.

8

9    _\s\ Lisa Reed Wiesman_                    ____July 28, 2025____
LISA REED WIESMAN, RDR-CRR              Date of Certification
10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25